FILED

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

2020 SEP 14 PM 1:47

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

UNITED STATES OF AMERICA

v.

ANASTASSIA BOGOMOLOVA

Case No. 8:14-cr-217-T-33TGW

EMERGENCY MOTION REQUESTING

LEAVE TO FILE A REPLY

Bogomolova, proceeding pro se, is respectfully requesting leave to file a reply
to the Government's response to her Emergency Motion for Compassionate Release
due to devastating pandemic of COVID-19 in her BOP facility, which resulted in
an inmate's death; and a recent decision of Miami District Court which granted
a Compassionate Release to an inmate from the same facility with confirmed
diagnosis of Legionnaires' Disease.

   Bogomolova's response is enclosed with this motion.

Respectfully submitted,

*Bogomolova*

Anastassia Bogomolova 60833018

CERTIFICATE OF SERVICE PURSUANT TO 28 U.S.C. SECTION 1746

I certify in good faith that today, September 9, 2020, I am mailing the foregoing
document by First Class MAil, by placing it in a sealed envelope, bearing sufficient
postage for delivery by United States Postal Service, and giving it to a prison
officer per lockdown mail collection procedures at FCC Coleman, Camp, to be mailed
to Clerk of Court, United States Courthouse, 801 North Florida Avenue, Tampa,
Florida 33602, USA.

   I respectfully request that a copy of this motion be forwarded to all interested
parties via the CM/ECF System, as the movant is detained and has no access to
electronic filing system.

*September 9, 2020*

*Bogomolova*

Anastassia Bogomolova 60833-018
Federal Correctional Complex - Camp, Unit F-1
PO Box 1027, Coleman FL 33521, USA

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                    Case No. 8:14-cr-217-T-33TGW

ANASTASSIA BOGOMOLOVA

RESPONSE TO GOVERNMENT'S RESPONSE

TO EMERGENCY MOTION FOR COMPASSIONATE RELEASE

Since the submission of the Emergency Motion for Compassionate Release on August 3, 2020, the situation with COVID-19 in BOP and in Coleman Camp has deteriorated as described below. Bogomolova is proceeding pro se.

Despite implementation of the BOP plan, by the end of August infection rate among BOP inmates reached 8.5% (12,074 cases per 141,279 inmates as of 8/29/2020), exceeding over 4 times the infection rate in USA, which was 1.8% (6 mln. cases per 238 mln population).

BOP's multiphased plan did not specify any treatment for infected inmates, other than placing them in medical isolation, monitoring and "managing" them. This treatment of infected inmates resulted in the mortality rate among confirmed cases of 9.6% (117 deaths out of 12,074 infected), which by the end of August was 3 times higher than in USA, which was 3.2% (182,000 deaths out of 5,693,000 infected, as of 8/29/2020).

Not all BOP facilities are equally affected. Some facilities have few cases of COVID-19 and no deaths, while others have majority of inmates infected and several deaths.

Courts have repeatedly found that in BOP facilities with high number of infections, BOP had failed to mitigate the spread of the virus, doc. 455, pp. 16, 17. Not a single case states that in a facility with multiple infections

1

BOP's plan is adequately protecting the inmates. Unfortunately, Bogomolova's facility is severely affected by the virus.

Coleman Camp is under administration of Coleman Low Prison. A recent case, United States v. Riccardi, 2020 U.S. Dist. LEXIS 131085, 02-20060-JWL, D. Kansas, July 24, 2020 describes this outbreak and states that this "outbreak suggests that the BOP's preventative measures have not been successful at the facility," Coleman Low.

### i. Summary of constitutional violations:

The government opened the door to discussing constitutional violations related to specific conditions of Bogomolova's confinement.

"Prison officials have a responsibility to protect inmates from substantial risks to their health and safety." Chunn v. Edge, 2020 U.S. Dist. LEXIS 100930, 20-cv-1590(RPK)(RLM), E.D.N.Y., June 9, 2020, citing Farmer v. Brennan, 511 U.S. 825, 128 L. Ed. 811, 114 S. Ct. 1970 (1994). "This duty has special urgency during the COVID-19 Pandemic." Id., collecting cases from facilities where such substantial risks were found. In Wilson v. Williams, 2020 U.S. Dist. LEXIS 70674, 4:20-cv-00794, N.D. Ohio, Apr. 22, 2020, the court found that "...inability to adequately protect the inmates from the risks posed by coronavirus subjects the prisoners to substantial risks of harm in violation of their Eighth Amendment rights."

"Eighth Amendment requires a remedy for exposure of inmates to 'infectious maladies'... even though the possible infection might not affect all of those exposed." Farmer, citing Helling v. McKinney, 509 U.S. at 33-34, 125 L. Ed. 2d 22. 113 S. Ct. 2475 (1993). Bogomolova's Eighth Amendment rights have been violated by exposure to two infectious maladies: legionella bacteria and coronavirus.

"Having stripped prisoners of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." Farmer, cited above. While

2

legionella infection was treatable with antibiotics, if Bogomolova develops a serious infection from COVID-19, the "state of nature" will "take its course", as there is no treatment within BOP.

Bogomolova's Fourteenth Amendment right has been violated by invading her bodily integrity. "Involuntary subjecting non-consenting individuals to foreign substances... is a classic example of invading the core of the bodily integrity protection." Brown v. Snyder (in re:Flint Water Cases), 2020 U.S. Dist. LEXIS 54460, March 27, 2020, citing Guertin v. State, 912 F.3d 907, 920-21 (6th Cir. 2019). Inhaling legionella bacteria suspended in evaporating water, provided by BOP was ceratinly involuntary, and resulted in Legionnaires' disease.

ii. Coleman Camp is uniquely affected by two infectious outbreaks in a row.

Legionella outbreak was well-documented. Because legionella is a water-borne bacteria and all available water was provided by FCC Coleman Camp, the camp is responsible for infection. As a result, Bogomolova had Legionnaires' disease, which has 10% mortality rate for her age group. While inmates were informed about the outbreak by the Warden of FCC Low (Exh. J7 , Doc. 455), they were never informed that the outbreak is over, or that the water is safe to drink. Installed filters were quickly clogged and removed (Exh. H5, Doc. 455), and currently there are no filters, not even showerheads, the water comes straight from the pipes. Until recently, water occasionally turns yellowish, in April (Exh. I-4, Doc.455), in June (Exh. I-7, Doc. 455), and most recently, September 3, despite all water treatment. As this response is written, the F-1 unit with remaining 40 COVID-negative inmates still have same problems, leaks, dripping showers, broken toilets, excessive humidity in the shower/bathroom area due to disconnected AC. Bogomolova has been confined to this sick building 24/7 since the beginning of the lockdown.

3

While many inmates at the camp were infected with legionella during the outbreak, the majority experienced a lighter version of the disease (Pontiac fever) and recovered within few days. The fact that Bogomolova and the few others developed pneumonia (Legionnaires' disease) speaks of her already weakened lungs and immune system even before the infection. While long-term effects of Legionaires' disease are not well-studied, it is known that the infection affects all vital organs, causing kidney failure, congestive heart failure and pulmonary failure (Brown v. Royal Carribean Cruiser, 2017 U.S. Dist. LEXIS 39644, 16-24209-cv-Scola, S.D. Fl. Mar. 16, 2017).

The conditions at the camp resulted in a TRO complaint filed by another inmate, Kara Adams. Bogomolova provided an affidavit for her complaint. Because Adams, pro se, could not legally represent other inmates, Bogomolova filed for a joinder, which was denied without prejudice. Later, Adams was appointed an attorney, who refiled for a class action certification. To the best of Bogomolova's knowledge, it is still pending, but Bogomolova never heard that she is or will be part of the class. Adams has been released to home confinement, and her case became moot. Thus, the current motion is Bogomolova's only remedy.

The camp administration, in responding to the Adams complaint, stated that only two inmates had Legionnaires' disease, and they were closely monitored. In truth, Bogomolova was asking for a follow-up test for legionella antigen, blood work and test for liver and kidney function a month after she tested positive, (Exh B6, Doc. 455). When she was finally re-tested after 2.5 months after initial positive test, her immune response was still elevated, which can be due to either past or ongoing infection. The fact that in April she tested negative for legionella pneumophila serogroup 1 cannot be used as a proof that Bogomolova is legionella-free, as this test "does not detect other Legionella species or serogroups", see exhibit U1 of this motion (Bogomolova only received

4

a copy of this test on September 4, despite earlier requests for medical records). She had no follow-up since April regarding legionella.

Because Bogomolova was only one of the two confirmed cases with Legionnaires' disease at the camp, she is uniquely adversely affected. Importantly, a second inmate who had Legionnairs', Sandra Huarte, has recently received a compassionate release from Miami District Court, United States v. Huarte. 2020 U.S. Dist. LEXIS 136561, cr. case 11-20587-Scola, S.D. Fl., July 31. 2020)

In granting Huarte compassionate release, Judge Scola acknowledged the "unprecedented pandemic, which exploded at Huarte's facility", and even waived the requirement to exhaust administrative remedies. Since his decision, the pandemic at the camp got worse. Judge Scola stated that Huarte "suffers from an acute upper respiratory infection called Legionnaires' disease". But if the legionella outbreat at the camp is over, and there are no ongoing cases, like the camp administration stated in Kara Adams case, Huarte's Legionnaires' cannot be acute. If it is acute, then the threat of legionella infection is ongoing.

In any case, Bogomolova believes she should be equally protected as Huarte, who is the same age (57 y.o), was in the same facility, and had the same disease.

Bogomolova never claimed that her Legionnaires' disease alone entitles her to compassionate release. Bogomolova is asking, and was asking throughout her administrative remedies  to consider Legionaires' disease as a factor increasing her risk for severe illness from COVID-19, similar to what was done in Huarte's case.

iii. Coleman Camp inmates are not protected from  COVID-19  infection.

1. Coleman administration disregarded the BOP and CDC guidelines, which resulted in bringing infection to the camp. Phase 5 of BOP plan started the lockdown which is still ongoing. The inmates were supposed to be "secured in their assigned

5

cells/quarters to decrease the spread of the virus". That did not happen in the camp. Despite the lockdown by the unit, camp inmates from all units continued to work in outside facilities (email to Warden 4/3/2020, Exh. M1; email to Warden 6/12/2020, Exhibit L4, Doc. 455). In June and July, while the camp had no confirmed COVID-19 cases, camp inmates were sent to work at higher security Coleman prisons, even after these facilities had confirmed cases (email to Warden 6/9/2020, Exh. M2; email to Warden 7/4/2020, Exh. V-1 of this response. Due to inaccesible printer, Bogomolova is providing a retyped copies of her emails as exhibits).

Not only sending the camp inmates to work at the infected facilities violated BOP's guidance, it also violated CDC's guidelines for correctional facilities (https://www.cdc.gov/coronavirus/2019-ncov/community/corrections-detention/guidance-correctional-detention.html). The CDC said (p. 14 of guidelines): "If there has been a suspected COVID-19 case inside the facility... suspend all transfers of incarcerated/detained persons **to** and **from** other facilities (including work release where relevant". Despite this guideline, camp inmates were sent to work to facitities with COVID-19 cases, which brought infection to the camp.

2. Coleman administration disregarded quarantine practices recommended by BOP and CDC, which resulted in uncontrollable spread of infection.

After the first confirmed (by testing) and suspected (women with symptoms) cases appeared at the camp, all their "close contacts" were supposed to be quarantined, according to Phase 6 of BOP plan and CDC guidelines (pp. 14,19 of guidelines). CDC instructs that "close contact can occur while... living with... or sharing common space with a COVID-19 case". That did not happen.

In Coleman camp, F4 unit had confirmed/suspected cases, and the entire unit should have been quarantined, according to CDC: "If an entire unit is under quarantine, due to contact with a case from the same housing unit, the entire

unit may need to be treated as a cohort and quarantined **in place**".

But instead of being "quaratined in place", over 50 close contacts of symptomatic inmates from F4 were moved, without prior testing, with the general population in F1 unit. As a result, "close contacts" from F4 were now sharing bunk beds with previously unexposed F1 inmates.

CDC guidelines state: "Facilities should make every possible effort to quarantine close contacts of COVID-19 cases individually... Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected". This is exactly what happened at the camp, transmission from those who were infected to those who were uninfected. Not only close contacts from F4 were not quarantined individually, they were not quarantined as a cohort in place. Instead, they were moved to a different unit and mixed with uninfected inmates from F1.

This mixing of exposed inmates with general population also disregarded Phase 6 of BOP plan, which stated: "At all institutions, compartmentalization of... inmate movement will continue to help slow the cross-contamination of... housing units." Instead, at the camp infection was spread from one unit to another.

In addition, the CDC instructs "to be especially mindful of those who are at higher risk of severe illness from COVID-19. Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accomodations to reduce exposure risk for high-risk individuals". But this was not followed in Coleman camp. Not only the elderly and medically vulnerable inmates in F1 were not given any extra precautions, the "close contacts" from F4 were placed right in their cubes, on the same bunk bed within 6 feet of them. With the unit filled to capacity as a result of this move, social distancing, urged by CDC in quarantine, became completely impossible.

Next, Phase 6 of BOP plan states that infection prevention and control practices "include identifying symptomatic inmates as early as possible by assessing for COVID-19 symptoms and conducting temperature checks"; and CDC guidelines instruct to monitor quarantined close contacts for symptoms twice a day for 14 days. But that did not happen either. After F4 inmates were mixed with F1 inmates in F1 on July 7, filling the unit to capacity, there were no temperature checks until July 13, and symptom check did not happen until August. The forced proximity of inmates in a full unit resulted in virus spread, as there was no social distancing 24/7, and inmates were congregating everywhere, even in line to the bathroom (Exh . V-2, email to facilities 7/10/2020; Exh. V-3, email to Warden 7/10/2020).

On July 8 all inmates in F1 were tested with PCR test for COVID-19. The results were slow to come. On July 11 and 12, 17 women were found positive and were moved to medical isolation. On July 13, two more were found positive/symptomatic, and were moved to isolation. On July 14, 28 more women from F1 were found positive, were moved to isolation, and 10 of their roommates were moved to a unit which has not been tested, F3. On July 16, six more inmates were found positive in F1 and were moved to isolation. On July 20, 13 COVID-negative inmates were moved from F3 to F1 (the rest of F3 inmates, about 50 women, were positive). On July 22, six more inmates from F1 tested positive with a rapid test, and were moved to isolation. On August 27, after re-testing remaining inmates in F1 with a rapid test, 16 tested positive and were moved to isolation. By the end of August, only 41 women remained COVID-negative out of 210 women at the camp, corresponding to the infection rate of over 80%. Bogomolova described the July and August events in emails to a friend, Exh. W1-W4.

The infection rate at the camp is among the highest in BOP, compared to other facilities (Carswell 50%, Elkton FCI 55%, Butner Low 60%, Terminal Island 69%,

8

Lompoc FCI 76%, Segoville 82%, calculated for the data from 8/29/2020). BOP website does not show the number of camp infections separately from Coleman-Low, because the camp is under Low administration right now, but the majority of infections listed under Coleman-Low are in fact at the camp.

The anomaly high rate of infections at the camp, which exceeds over 9 times the average infection rate in BOP (8.5%), shows that administration had already failed to protect the vast majority of inmates from COVID-19 infection.

Phase 9 of BOP plan is focusing on reopening, with UNICOR being up to 80% operations by September, and by 100% operations by October. BOP is also planning to reopen visitation in October. There is no reason to believe that the remaining uninfected inmates, and Bogomolova among them, will remain uninfected or be better protected than the 80% of Coleman camp inmates who became infected while in BOP care and under administration of FCC Coleman.

### iv. Treatment of infected inmates and inmate death in Coleman camp.

Coleman administration disregarded medical isolation practices by BOP and CDC. Thus, BOP Phase 6 of the plan states: "Those with COVID-19 symptoms or a temperature over 100.4 degrees of Farnheight will be placed in isolation". It did not happen for Saferia Johnson, who reported symptoms (shortness of breath) on July 15. She was not moved into medical isolation until she tested positive on July 19. According to CDC: "Facilities should make every possible effort to place suspected and confirmed cases under medical isolation individually. Each isolated individual should be assigned their own housing space and bathroom where possible. Cohorting should only be practiced if there is no other available option." CDC confirms that "as soon as individual develops symptoms... they should be immediately placed under medical isolation".

9

According to CDC, "if the number of confirmed cases exceeds the number of individual isoaltion spaces available in the facility, be especially mindful of cases who are at higher risk of severe illness from COVID-19. Ideally, they should not be cohorted with other infected individuals. If cohorting is unavoidable... Allocate more space for a higher-risk individual within a shared medical isolation space. Persons with higher risk may include older adults and...persons...with serious underlying medical conditions such as lung disease, heart disease and diabetes."

In Coleman Camp, the number of confirmed cases exceeded the number of few individual isolation spaces as early as July 7. Prior to that, four individual cells in Coleman Low were used for camp suspected cases. The camp was not ready to medically isolate a large number of inmates, despite the Phase 6 of BOP plan which instructed to identify "locations for quarantine and isolation of potentially large number of inmates".

As a result, once multiple inmates in F4 developed symptoms or tested positive, there was no place to medically isolate them, so instead they were kept in place. The rest of the F4, i.e. the close contacts of infected inmates, instead of being quarantined in place following the CDC guidelines, were moved and mixed with inmates in F1, further spreading the disease.

Once F4 became a medical isolation unit on July 7, no special precautions were followed for high-risk individuals despite CDC guidelines. The newly-confirmed cases from F1 were moved into F4 and placed in double-occupancy cubes. Implementation of social distancing in medical isolation, while recommended by CDC, was completely disregarded.

Finally, the CDC guidelines specify that "Facilities should ensure that incarcerated individuals receive medical evaluations and treatment at the first sign of COVID-19 symptoms. If a facility is not able to provide such evaluation

and treatment, a plan should be in place to safely transfer the individual to
another facility or local hospital."

In spite of the fact that Saferia Johnson had risk factors for severe illness
from COVID-19, she spent over a week struggling to breathe before she was taken
to a hospital, where she was placed on a ventilator. Few days later she passed
away. https ://www.miamiherald.com/news/special-reports/florida-prison/article
244718922.html, "Woman Asked for Compassionate Release. The Prison Refused. She
Just Died of COVID-19". The tragic death of Saferia Johnson, a 36-y.o. mother
of two young children, who was not given a death sentence, shows that FCC Coleman
failed to protect her health, treat her for COVID-19, or save her life.

Coleman facility is a subject of ongoing DOJ OIG investigation. Stephanie
Coueignoux, Feds Inspect Coleman Prison Following Second Coronavirus Inmate Death,
https://www.mynews13.com/fl/orlando/watchdog/2020/08/12/watchdog-coleman-federal-
prison-inspected-covid-19?cid=share_email, article in Miami Herald Aug 12, 2020.

v. Current situation in Coleman Camp

On August 10, several previously infected inmates (confirmed cases) started
working in camp food service, without being re-tested. See email to Food Services,
8/10/2020, email to Warden 8/10/2020, Exh. X-1; email to Health Services 8/11/2020,
Exhibit X-2; email to Medical Department, 8/14, Exhibit X-3.

Currently inmates who previously tested positive cook and serve food to F1
COVID-negative inmates, who are still in quarantine, in violation of BOP Plan
Phase 6, which says that "institutions with active COVID-19 transmission should
satellite-feed all inmates in their units. Meals... should only be served by
staff wearing proper PPE. When meals are being distributed, a distance of 6 feet
between inmates should be observed". In disregard of this instruction, inmates
who work in the kitchen pass food from hand to hand to quarantined inmates, and
food service officer does not always wear a mask.

11

Allowing previously infected inmates to come in daily contact with quarantined inmates is irresponsible, as the virus can remain in positive individuals up to 90 days. After expiration of the ongoing quarantine, the COVID-negative inmates will be mixed with the "general population", all of whom were COVID-positive less that a month ago. It seems like all inmates of Coleman camp will inevitably be infected, as the camp reopens and starts receiving new inmates and resumes UNICOR.

Bogomolova was able to maintain her COVID-negative status thus far. She has little hope that she will remain negative much longer. She is unsure what infection will result in and she is fearing for her life. She believes that her Legionnaires' disease, and the risk of COVID-19 infection was not part of her sentence, and her current punishment exceeds the one originally imposed. She is asking for sentence reduction to time served.

In her original motion, Bogomolova was asking, as alternative, for a smaller sentence reduction of 4 years, not because she is entitled to it, like the government stated in their response, but to allow BOP to protect her by considering her for home confinement. Contrary to what the government states, Bogomolova never asked the judge to order her placement to home confinement, this is the function of BOP. The Attorney General's Directives "required BOP to  identify the inmates most at risk from COVID-19 and to consider the totality of circumstances for each individual inmate in deciding whether home confinement is appropriate... These Directives did not requre inmates to have served a specific length of their sentences to be considered for home confinement...After the Attorney General issued its Directives on March 26 and April 3, 2020, the BOP changed its protocols and **instead** required inmates to have served at least 50% of their sentences to be eligible for home confinement." United States v. Reddy, 2020 U.S. Dist. LEXIS 82208, 13-cr-20358, E.D. Mich, MAy 11, 2020.

Because BOP substituted the medical criteria listed by the Attorney General
by the length-of-sentence criteria, it is using the additional risks posed by
COVID-19 as a punishment as it generally refuses even to evaluate inmates for
medical vulnerabilities unless they reach 50% of the sentence. "BOP has directed
its wardens not to evaluate inmates for release under the Attorney General's
criteria unless they have served 50% of their sentence.". United States v. Pena,
2020 U.S. Dist. LEXIS 94127, 16-10236-MLW, D. Mass., May 29, 2020. However, it
is the function of the court and not BOP to define the severity of punishment.

Bogomolova asked her risk factors to be evaluated by BOP, email to Health
Services, 7/15/2020, Exh. Y-1. She never heard back.

Currently BOP is subtracting good time from their 50% calculation, and
Bogomolova is at 44.9% of her statutory term as of 8/31/2020. Even a smaller
sentence reduction will allow her to be considered for home confinement by BOP
while she is still COVID-negative, and may save her from infection and its
consequences. See Exhibit Z-1 for Sentence Computation Sheet.

"The impossibility of adequate social distancing...due to the very structure
of the facility — continues to pose a grave risk to vulnerable inmates' health...
Without social distancing measures, reliable containment of a highly contagious
disease is nearly impossible. This makes transfer to home confinement... (or
compassionate release..) the only viable measure by which the safety of highly
vulnerable inmates can be reasonably assured", Martinez-Brooks v. Easter, 2020
U.S. Dist. LEXIS 83300 3:20-cv-00569(MPS), D. Conn., May 12, 2020.

Bogomolova is asking the court to consider the unique pandemic at Coleman
camp, her unique vulnerability due to Legionnaires' disease and the relevant
case of Huarte, and grant her sentence reduction, to protect her health and life.

Respectfully submitted,

Anastassia Bogomolova 60833018

13

CERTIFICATE OF SERVICE PURSUANT TO 28 U.S.C. SECTION 1746

I certify in good faith that today, *September 9, 2020* , I am mailing by
first class mail the foregoing document, by placing it in a sealed envelope,
bearing sufficient postage for delivery by United States Postal Service, and
giving it to the prison officer per lockdown mail collection procedures at
FCC Coleman, Camp, to be mailed to the following recopients:

Clerk of Court
United States Courthouse
801 North Florida Avenue
Tampa, FL 33602, USA

The movant further requests that a copy of this pleading be forwarded to all
interested parties via the CM/ECF System, as the movant is detained and has no
access to electronic filing system or a copier due to COVID-19 lockdown.

*Bogomolova*
Anastassia Bogomolova 60833-018
*September 9* , 2020
Federal Correctional Complex - Camp,
Unit F-1, PO Box 1027,
Coleman FL 33521, USA

Litigation is deemed filed at the time it was delivered to prison authorities.
Houston v. Lack, 487 US 288, 101 L Ed 2d 245, 108 S Ct 2379 (1988)

"A remedy for unsafe conditions need not await a tragic event."
Thakker v. Doll, 2020 U.S. Dist. LEXIS 59459 at 7, 1:20-cv-0480,
M.D. Pa, March 31, 2020.

14